496 P.2d 666

**Margaret YEARSLEY, Plaintiff-Respondent,**

v.

**Leon C. YEARSLEY, Defendant-Appellant.**

No. 10938.

Supreme Court of Idaho.

April 27, 1972.

Johnson & Olson, Pocatello, for defendant-appellant.

Max F. Parrish, Pocatello, for plaintiff-respondent.

McQUADE, Chief Justice.

On May 12, 1964, Margaret Yearsley was granted a divorce from her husband, Leon C. Yearsley. The plaintiff-wife was represented by counsel. The husband made no appearance and a clerk's default was entered. After a hearing the district court entered a decree whereby custody of Theresa Yearsley, then a one year old, was awarded to the plaintiff together with monthly support payments for the child.

At some time in late 1965, the father, Leon Yearsley, obtained temporary control of the child, Theresa, from the mother. Leon stated that at the time he was not in a position to make a home for Theresa. He therefore placed the child with the Alva Butler family, whose relationship with the Yearsleys is not made clear from the record. Subsequently, Leon filed an affidavit alleging unfitness of the mother to obtain permanent custody of the child and to obtain temporary custody of the child until the allegations could be investigated. The trial court granted the father's request for temporary custody and issued an order to the mother to show cause why the father should not be given permanent custody.

The mother answered with an affidavit alleging failure of the father to abide by previous orders of the court regarding visitation rights and support payments, and denying any neglect of the child.

On January 7, 1966, after a hearing with both parties being present and both being represented by counsel, it was stipulated that an independent investigation be made of both parties by Jack Contor of the Department of Public Assistance to determine their suitability regarding custody of the child. In the meantime, the child was to remain with the father, who had placed the child with the Butlers. On February 11, 1966, apparently after the investigation had been completed, the trial judge issued a memorandum decision and order stating that it was his determination that neither the father nor the mother was suited to have custody of the child and that the child should be placed with the Alva Butler family, with Leon paying monthly support. The court granted visitation rights to both Leon and Margaret, but stated that the child was not to be placed with any family other than the Butlers without the express consent of the court.

In August, 1970, the father petitioned the court alleging changed conditions since the decree of February 11, 1966, and asked custody of Theresa. In support of his petition Leon filed an affidavit stating that he was no longer in debt and was in a position financially and otherwise to properly care for his daughter. He stated that his mother, Theresa's grandmother, would keep house for them.

The petition was heard by the district court on October 23, 1970. The record does not disclose any attempt to notify the natural mother and original plaintiff Margaret Yearsley of this proceeding. She did not appear nor did the Butlers and Theresa. Leon testified as to why he should have custody of the child. Two other witnesses also testified on behalf of the father.

At the conclusion of the hearing the trial court stated it would take the case under advisement. The trial court informed the petitioners that:

"I might also say to you that I might have the Department of Public Assistance give me a report on this, and if I do this, it will be a little while before a decision comes down."

Petitioner's attorney made no comment regarding that statement.

On November 24, 1970, the trial court wrote a letter to the Department of Public Assistance stating that a motion had been made in the Yearsley case which the department had investigated previously, and asking that the custody of Theresa be changed from the Butlers to Leon's grandmother since the child would be happier there. The

trial court also stated in the letter that he thought the Butlers had made a fine home for Theresa and that he doubted the child would be happier with the grandmother. Nevertheless, the trial judge requested the Department of Public Assistance to investigate the grandmother's home and talk to the Butlers concerning Theresa.

On December 16, 1970, the Department of Public Assistance made its report to the court. The report appears to be objective and favorable to both parties investigated. But, it concluded that:

> "It is our opinion that because of Mrs. Yearsley's age and also that Theresa would be alone [after the girl was settled, Leon would not live with the grandmother and child, but would return to his home in Pocatello and visit them on weekends], it is not in her best interest to place her in this household. The Butlers have provided a good physical environment, as well as a healthy emotional environment for Theresa. She has become part of the family and it would undoubtedly be emotionally upsetting to Theresa to move her from this household."

On January 15, 1971, the trial court issued its memorandum decision and order based on the evidence from the hearing and the report of the Department of Public Assistance. The court stated that there was no question that the grandmother was a fine woman and would exert a good influence on the child in question. However, the trial court noted the grandmother was some what "advanced in years" (67 years old) while the child was of a "tender age" (eight years old). The trial court noted that since 1966 the Butlers had done an excellent job in taking care of Theresa and that the child was very fond of them as well as their children, one of whom was about the same age as Theresa.

The trial court concluded that it is better for a young child to be raised by someone in an age group such as the Butlers and that

it would be in the best interest of the child to be left with them. The court ordered that she remain with them and denied the petition.

Leon Yearsley has appealed from that order. The appellant has made no assignments of error as required by Rule 41(2) of this Court. However, this procedural error on the part of counsel should not be fatal to further review in this case where the immediate welfare and future life of the child, who is neither an appellant nor respondent, is at stake. Therefore, we will address ourselves to the issues appellant raises in his argument.

The general rule in Idaho is that in normal situations, the natural parents are entitled to custody of the child unless it is affirmatively shown that the parent has abandoned the child or that he is unsuitable. See I.C. § 32–1007:

> *"Rights of parents over children.*—The father and mother of a legitimate unmarried minor child are equally entitled to its custody, services and earnings. If either the father or mother be dead or be unable or refuse to take the custody or has abandoned his or her family, the other is entitled to the child's custody, services and earnings."

However, this right is not absolute and is qualified.[1] In an action such as the one at bar, the general rule will be followed unless it is affirmatively shown that both parents are unfit to have custody, or that they are unable to properly maintain the child and provide for proper training and education.[2]

On February 11, 1966, the trial judge issued a memorandum decision and order stating that it was his determination that neither the father nor the mother was suited to have custody of the child and the child should be placed with the Butler family. The party seeking modification of a divorce decree has the burden of proof

1. Clark v. Jelineck, 90 Idaho 592, 414 P.2d 892 (1966); Andrino v. Yates, 12 Idaho 618, 87 P. 787 (1906).

2. Piatt v. Piatt, 32 Idaho 407, 412, 184 P. 470 (1919).

regarding change of conditions of the parties involved.[3] The proof must establish:

"[S]uch changed conditions and circumstances that the best interests and welfare of the minor children *required* the trial court · to exercise its discretionary powers, thereby to modify the original decree." (Emphasis added) [4]

It should be emphasized that the case at bar originated in 1964 in a divorce proceeding and that the district court has maintained continuing jurisdiction over the matter of custody of the minor child since that time. It was determined in 1966 by the district court that the father was not suited for custody of the child and legal custody was granted to the Butlers. This fact clearly distinguishes this case from those such as Spaulding v. Childrens Home Finding and Aid Society,[5] where no such finding of unsuitability had been made regarding the appellant.

▆ In determining whether the trial court was required to exercise its discretion and thereby modify the decree [6] because of the evidence offered by the father, the case of Application of Altmiller [7] is on point:

"In cases of this nature, three rights of interest are to be considered: First, that of the parents; second, that of the person who has for years discharged all the obligations of the parents; third, and *chiefly,* that of the child." (Emphasis added.)

While *Altmiller* was a habeas corpus proceeding by the father against the grandmother for custody of the minor daughter, this Court stated that the same principals should govern the actions of courts in awarding custody as govern divorce proceedings.[8] In *Altmiller,* as in the case at bar, the child had been living for almost seven years with the party from whom custody was sought. This Court stated that in such a situation it *must* take into consideration,

"[N]ot only the age and sex of the child, but its prior custody and all other facts and circumstances affecting the welfare and best interests of the child * * *. It is far better for a child of innocent years to live among the people and with the attachments formed in childhood than to be torn away from familiar scenes, friendly faces and kindly voices, to be cast into a strange environment." [9]

This Court went on to hold that while on the record both parties were fit and proper persons to have custody of the child, the party who had been in custody for almost seven years was *better fitted* to have custody of the young girl than was the father.[10] Therefore, we cannot say that the district court acted improperly in leaving the custody of the child with the Butlers.

Appellant has also argued that he had no way of knowing that the report by the Department of Public Assistance, together with its concluding opinion, had been submitted to the district court. Also, appellant maintains that he had no opportunity to examine or cross-examine the report and that no proper foundation had been laid for the "witness"-investigator to give an opinion and "testify" as an expert witness.

▆ The general rule regarding this contention is that, in the absence of the consent or acquiescence of the parties, the report must be made in open court with the right of confrontation and cross-examination of the report and the investigator afforded to the objecting party.[11]

3. Larkin v. Larkin, 85 Idaho 610, 615, 382 P.2d 784, 787 (1963).

4. *Id.,* at 615.

5. 89 Idaho 10, 28, 402 P.2d 52 (1965).

6. Piatt v. Piatt, *supra note* 2.

7. 76 Idaho 521, 525–526, 285 P.2d 1064, 1068 (1955).

8. Id., at 526.

9. Id., at 527.

10. Id., at 527.

11. Callan v. Callan, 5 Ill.App.2d 480, 125 N.E.2d 854 (1955); Commonwealth ex rel. Kuntz v. Stackhouse, 176 Pa.Super. 361, 108 A.2d 73, 35 A.L.R.2d 630 (1954); Fewel v. Fewel, 23 Cal.2d 431, 144 P.2d 592 (1943).

The fact that counsel did not object or reserve the right of confrontation when informed by the district court at the October 23, 1970 hearing that the court "might" have such a report made, should not provide the basis for a qualification of the general rule.

Appellant should have been afforded the right to confront the investigator and report in open court. On remand the trial court must also make a finding regarding service of the notice of hearing on the mother.

Order vacated and cause remanded for further proceedings not inconsistent with this opinion.

DONALDSON, J., and MAYNARD, D. J., concur.

SHEPARD, Justice, dissenting, in which McFADDEN, Justice, concurs.

I concur in the majority opinion to the extent that it reverses the order of the trial court denying the petition of the father.

I dissent from the majority opinion insofar as, aside from the welfare worker's report, the action of the trial court is inferentially affirmed. The majority opinion tacitly at least approves the action of a trial court which deprives a natural parent of the custody, care and control of his minor child and turns custody of that child over to persons, who for all the record shows are complete strangers to the child and her family.

I have labored under the impression that the termination of a parent-child relationship in Idaho could only take place pursuant to our stringent statutory procedures under the Idaho Child Protective Act (I.C. § 16–2001, et seq.). *See:* State ex rel. Child v. Clouse, 93 Idaho 893, 477 P.2d 834. It is my opinion that the majority herein overturns what has been the long established law in Idaho, both by statute and an unbroken line of decisions culminating most recently in Freund v. English, 83 Idaho 140, 358 P.2d 1038; Spaulding v. Children's Home Finding and Aid Society, 89 Idaho 10, 402 P.2d 52; and Blankenship v. Brookshier, 91

Idaho 317, 420 P.2d 800. Those cases, and others cited therein, have uniformly held that in accordance with I.C. § 32–1007 and I.C. § 15–1805, the natural parent has the right to custody and guardianship of his children.

I disagree with the statement in the majority opinion that the general rule in Idaho is that in *normal situations* the natural parents are entitled to custody of the child. I would state the rule thusly: Natural parents are entitled to custody of their children except under the most extraordinary situations. In such extraordinary situations it must be shown that the parent has abandoned the child or that the parent is patently unfit to have custody, or unable to provide the necessaries for such child. I emphatically disagree that any rule should be adopted in Idaho stating that a trial court can divest a parent of the custody of a child and give it to a stranger merely on the showing that the stranger may be *more suitable* to have custody than would be the parent.

Perhaps the most striking recent indication of judicial thinking in this field was this court's decision in Duncan v. Davis, 94 Idaho 205, 485 P.2d 603. In that case a 19 year old mother sought the return of her illegitimate child which she had voluntarily relinquished and abandoned to a child adoption agency approximately one and a half years before. The court in that case essentially concluded that the parental-child relationship was so strong and so protected by the law that it should return the child to its mother. In that case there was no discussion of the greater suitability of the custodial persons vis-a-vis, the natural mother, nor of the welfare of the child. The custodial right of the natural parent therein was assumed to be almost absolute. I suggest that the decision of the majority herein cannot possibly be squared with the decision in Duncan v. Davis, *supra*.

I believe it necessary to emphasize that the father herein initially delivered the child to the Butlers because he was unable to care for her himself. He was em-

ployed in a job that took him away from home and at that time he also had severe economic problems. The mother of the appellant, the paternal grandmother of the child, was at that time employed full time and also had the care of an invalid husband. The grandmother has since retired from employment and her invalid husband is deceased. The mother of the child was alleged to have neglected the child and although no finding to that effect was entered by the trial court, it may be strongly inferred since the trial court took the custody of the child away from the mother. The trial court then ratified the action of the father in placing the child with the Butlers and ordered that he pay child support in the amount of $50.00 per month. Later in an order completely unsupported by any petition, notice, service or hearing, the father was required to increase that child support to $75.00 per month.

The father later petitioned the court for an order giving him custody of the child. That petition was supported by an affidavit stating the then conditions of the father and that he could now provide a home for the child. The files of the district court reflect service of the petition and affidavit on counsel for the plaintiff-mother. When the petition of the father came on for hearing the mother did not appear in person or by counsel.

At the hearing on the petition the only evidence presented was the testimony of the father, his sister, his aunt and his mother. Although a trial court has broad discretion in accepting or rejecting the testimony of witnesses who appear before him, in this case the testimony was uncontradicted, not inherently improbable and touched only upon the love the father had for his daughter, his desire to have her and the type of home and surroundings he would provide for her. Nowhere in the testimony was there more than mere mention of the Butlers or of the child's mother. Although examination of witnesses by the court is ordinarily frowned upon, in a case of this type the court, if it entertained doubts, could have examined any of the witnesses for additional information. The record reveals that the trial court did not examine any of the witnesses.

I then conclude that the trial court was required to accept the uncontroverted evidence of the father and his witnesses. There is nothing in the record to indicate that the father is not a fit and proper person to have the custody of his child, nor is there any testimony that he has abandoned his child. To the contrary the out-of-court statement solicited by the trial court reveals that the appellant and his mother are fit persons and would provide a suitable home for the child.

Almost the complete thrust of the majority opinion is based on the case of Application of Altmiller, 76 Idaho 521, 285 P.2d 1064 (1955). Therein the natural father of an eleven year old female child sought to regain custody from the maternal grandmother of the child. The father and mother of the child had been divorced, at which time the child was four years old. The court noted that during the next seven years until the commencement of the action the father had seen his child on only one occasion. He had never corresponded with her, nor had he contributed to her support in any way, shape or form, although he had been ordered to do so by the divorce decree.

The following language of the court in *Altmiller* adequately demonstrates the distinction between that case and the case at bar. Therein the court said:

"The evidence discloses that respondent did not take the interest in his child that a normal father would have, nor assume any responsibility for her. The appellant has had the child in her home since the child's parents separated in August, 1948, and the evidence discloses that there is a devotion between her and the child, while the father is a stranger to the child, having seen her only once since the separation. Although it is undisputed that the respondent is morally a fit and proper person to have the care,

custody and control of his minor daughter, Nancy, it is disputed whether or not he has a suitable and proper place to care for and educate her. The evidence discloses that he has not remarried, and he proposes to take Nancy to the State of Washington to live with him in a farm house on a 12,000-acre farm, where he has employment doing farm work. He testified that his employer's wife, who is 42 years of age and has never seen Nancy, will assist in caring for her. She and her husband live approximately one-fourth of a mile from the house that respondent proposes to occupy with his daughter. The evidence shows that respondent believes that his widowed aunt, 62 years of age, who lives in Oroville, Washington, three or four miles from where respondent proposes to live, would also assist in caring for Nancy. There would be no woman living in respondent's home.

\* \* \* \* \* \*

"Several witnesses testified as to appellant's fitness and the suitability of her home for caring for Nancy. In cases of this nature, three rights of interest are to be considered: First, that of the parents; second, that of the person who has for years discharged all the obligations of the parents; third, and chiefly, that of the child. (Citations) Each case of this nature, where the future welfare of a minor child is involved, must stand or fall upon the peculiar or particular facts and circumstances of the case before the court. There can be no binding—and very little helpful—precedent found in the decisions of the courts on this subject, because of this fact.

\* \* \* \* \* \*

"Custody of a minor child should be awarded to a parent unless it be affirmatively shown that he is unfit to have such care and custody, or that on account of circumstances surrounding him he is unable to provide proper training and education. Ordinarily, poverty of a parent is not sufficient reason for depriving him of the custody of his child.

Whether the proceeding be habeas corpus or a divorce proceeding involving the custody of a minor child, the same principles should govern the action of the courts in awarding custody."

In the case of Spaulding v. Children's Home Finding and Aid Society, *supra*, this court stated:

"If the parent is competent to transact his or her own business, and is not otherwise unsuitable, the custody of the child is not to be given to another, *even though such other may be a more suitable person.*" (Emphasis supplied)

The court further said, quoting from In re Martin, 29 Idaho 716, 161 P. 573:

"Parents should not be permanently deprived of the custody of their children and the right to act as their legal guardians, even when under certain circumstances the custody of the children must be temporarily surrendered, except in strict accordance with the statute and under circumstances which *fully warrant such drastic action.*

\* \* \* \* \* \*

"While either of the parents are competent, and not unsuitable, *they are absolutely entitled to the guardianship of their minor children. \* \* \*"* (Emphasis supplied)

The court in Piatt v. Piatt, 32 Idaho 407, 184 P. 470, stated:

"It is sometimes said that the welfare of the child is the only matter for consideration in making an order for its custody, but we think this expression is only qualifiedly true. The welfare of the child is perhaps of paramount importance, but it is not the only matter to be considered in determining to whom the custody of the child should be given. (Citations) In a divorce action, the custody of the children should be awarded to one or both of the parents, unless it be affirmatively shown that both parents are unfit to have such care or custody, or that they are unable to properly maintain them and provide for their proper training and education. Or-

dinarily, poverty of a parent is not a sufficient reason for depriving him of the custody of his child."

Contrary to the assertions contained in the majority opinion I find no basis in the record whatsoever to sustain any finding or conclusion that the father herein was "unsuited" to have custody of his child. In 1966 as aforesaid, the father having secured temporary custody of his child voluntarily delivered her to the Butlers for care. That action of the father was ratified by the trial court. The reason, as I perceive it for that action, was that the father was unable to properly care for the child at that time. Such is not the case at the present time.

I would point out that in many instances the record discloses remarks and conclusions by the trial judge which do not square with the record herein. The strong inference contained therein is that the trial judge had information which is not contained in the record presented to us. I believe we must presume that the trial judge gained knowledge and opinions in this matter from prior proceedings, the record of which is not available to us. While in an ordinary case, the action of an appellate court should be based solely upon the record, it is my conclusion that the matter should not be reversed and remanded with instructions for the trial court to grant the petition of the father. Rather, I conclude that the matter should be reversed and remanded to the trial court with directions that a full hearing be held upon the subject of the father's petition. The welfare of the child concerned in this matter demands that full hearing and investigation be made by the trial court into all matters, including the prior proceedings, the fitness and suitability of both parents, the fitness and suitability of the persons presently having custody, and the desires of the child. To that end and absent any action by the parties. the court should, upon its own motion, require the attendance and testimony of all parties concerned. If in the determination of the trial judge the child in question should not be examined in open court, the trial judge should interview the child in chambers. Thereafter, the trial court should be directed to make full findings and conclusions touching all matters as discussed herein.